111 121
r212s 444

## Oscar D. F. Conkey v. Lewis B. Rex.

### Gen. No. 4246.

1. APPELLANT'S BRIEF—*waiver by.* A failure by the appellant to argue a point in his opening brief, is a waiver of such point, and it can not thereafter be urged as a ground for reversal.

2. CONSTRUCTIVE MORTGAGE—*what does not establish abandonment of.* The execution of leases to the property involved by a constructive mortgagor, does not necessarily indicate his intention to abandon his rights as such mortgagor.

Bill to declare deed a mortgage. Appeal from the Circuit Court of LaSalle County; the Hon. SAMUEL C. STOUGH, Judge, presiding. Heard in this court at the April term, 1903. Affirmed. Opinion filed October 8, 1903.

M. T. MOLONEY and J. H. WIDMER, for appellant.

BREWER & STRAWN, for appellee.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

Lewis B. Rex began this suit on February 13, 1902, by

filing a bill of complaint against Oscar D. F. Conkey and his wife. The bill charged that Rex formerly owned one hundred and sixty acres of land in South Dakota; that he owed his brother-in-law, Conkey, $803, and on January 27, 1886, mortgaged said land to Conkey to secure the payment of said debt on January 1, 1891, with interest at eight per cent per annum; that on June 1, 1889, Rex purchased from Albert H. Carr eighty acres of land in La-Salle County, Illinois, described as the west half of the northeast quarter of section 29, township 36 north, and of range 2, east of the third principal meridian, (hereinafter called the Carr farm) for $4,400; that it was agreed that Conkey should release his mortgage on the Dakota land and that Rex should convey it to Carr, and Carr should take the same at $1,000 upon the purchase price of said Carr farm; that Conkey should execute to Carr two notes for $1,000 each, with interest at six per cent per annum, payable annually after March 1, 1890, one of said notes however to be due October 1, 1889, and the other October 1, 1890; that Conkey should assume a past due mortgage upon said Carr farm securing $1,400, due to Alexander Adams, with interest at six per cent per annum, payable annually, Carr, however, paying said interest to July 15, 1889; that Carr and his wife should convey said Carr farm directly to Conkey, and that Conkey should hold the same as security merely for releasing said mortgage on the Dakota land and for assuming payment of said $1,400 mortgage, and for the payment of said notes of $1,000 each to Carr; that Carr should retain possession of said Carr farm till March 1, 1890, and then deliver possession thereof to Rex; that Conkey should execute an agreement in writing with Rex to the effect that Rex should go into possession of said Carr farm on March 1, 1890, and continue therein, and when Rex should pay Conkey $1,000, Conkey should convey said land to Rex by warranty deed, and Rex should execute notes due in five years, secured by a mortgage on said Carr farm to Conkey, to secure the payment of the balance of the purchase money so paid and advanced by Con-

Conkey v. Rex.

key to Carr for Rex, and that till such payment of $1,000 and deed to Rex, Rex should pay Conkey seven per cent per annum upon the money advanced and to be advanced by Conkey to Carr for Rex.    The bill further averred that, on June 1, 1889, pursuant to such arrangements previously made between Rex and Conkey and Carr, Rex and his wife executed to Carr a warranty deed of said Dakota land; that Carr and his wife executed to Conkey a warranty deed of said Carr farm, subject to the payment of said $1,400 mortgage thereon, and reserving possession till March 1, 1890; that Conkey released his mortgage on the Dakota land and executed two notes to Carr for $1,000 each, payable October 1, 1889 and 1890 respectively, with interest at six per cent per annum after March 1, 1890, and accepted the deed from Carr, thereby assuming and agreeing to pay for Rex said $1,400 mortgage to Adams, and also, with his wife executed a mortgage on said Carr farm to secure said two notes of $1,000 each; and that said deeds, release and mortgage were acknowledged and recorded.    The bill further averred an agreement in writing on the same day between Conkey and Rex, to the effect that when Rex should pay $1,000 on his indebtedness to Conkey, Conkey should deed said Carr farm to Rex and take Rex's notes for the balance of the money so advanced by Conkey for Rex, secured by a mortgage on said land, which payments and mortgage Rex therein agreed to make and execute, and that Rex should have possession of said Carr farm and reside upon and work the same from and after March 1, 1890, and pay Conkey annually seven per cent per annum upon the sum so advanced and to be advanced by Conkey to Carr for Rex.    The bill further averred that this writing was left with Austin Smith, a justice of the peace at Mendota, in LaSalle County, for safe keeping, and so that each party might examine it from time to time, and that Conkey soon after obtained it from Smith and either retained or destroyed it; that soon thereafter Conkey ignored said contract and leased said Carr farm to Loren H. Carr and agreed to give him possession on March 1, 1890; that Rex learning this, took possession of said land

on February 26, 1890, and refused to surrender possession
to Loren H. Carr or to Conkey, but ever since has been in
possession of said land; that afterward Conkey made a con-
tract, purporting to be a lease of said land to Rex and his
wife for five years from March 1, 1891, for $336 per year
(which amount Conkey represented would be required to
pay the interest on said notes and on the money advanced
by him for Rex, and the taxes on said land), with a provis-
ion therein that when Rex paid Conkey $1,000, Conkey
would deed said land to Rex and take notes secured by
mortgage on said land for the balance of the money so ad-
vanced by Conkey to Carr for Rex; that when said lease
expired, Rex was unable to pay the $1,000, and Conkey
agreed to extend the time another five years, and prepared
and executed another lease to Rex and his wife for five
years, but fraudulently omitted the provisions for convey-
ing said land to Rex, and led Rex to believe that they were
inserted, and when Rex signed that lease he supposed they
were contained therein and did not know they were omitted
till just before the bill was filed; that when said second
lease expired on March 1, 1901, Rex was not able to pay
the $1,000, and Conkey made him another lease for one
year, leaving out the provisions relative to deeding the land
to Rex, but, being questioned by Rex about their omission,
agreed verbally with Rex that at any time when Rex would
pay him $1,000, he would deed the land to Rex and take
Rex's notes for the balance of the money so advanced by
Conkey for Rex, secured by mortgage on the land, and that
Rex then agreed to make such payment and execute such
notes and mortgage. The bill stated certain matters about
a tax title procured by Conkey on the Dakota land, and
that Rex gave his note to Conkey to reimburse him there-
for, and later a renewal note for about $146. The bill fur-
ther averred that in the fall of 1901, Rex informed Conkey
that he intended to pay the $1,000 and execute his notes
and mortgage as he had agreed, and that Conkey informed
Rex he must pay up all other matters, and then he would
talk with him about deeding the land; that Rex then dur-

ing that fall made payments finally liquidating the note
given to settle said tax deed matter, and Conkey and his
wife then quit-claimed said Dakota land to Carr.   The bill
further averred that about January 14, 1902, he offered to
pay Conkey $1,000, and to execute to Conkey notes for the
balance due Conkey and to secure them by a mortgage on
said land, and requested a deed of said land from Conkey,
but Conkey refused to accept such payment and notes and
mortgage, and to make such deed.   The bill further averred
that Conkey had paid Carr and Adams, and that the mort-
gages to them had been released; and that Rex had paid
$336 each year and had spent large sums in permanent im-
provements on said land while so in possession under said
arrangement; that $336 per year exceeded seven per cent
per annum on Conkey's advances and said taxes, and the
lease was a device to extort illegal interest from Rex.   The
bill averred that the deed from Carr to Conkey, though
absolute on its face, was not so intended by Rex and Con-
key, but was to be held by Conkey merely as security for
the payment of said money owed by Rex to Conkey and
advanced by Conkey for Rex, with interest thereon, and
upon payment thereof, Conkey was to convey said land to
Rex.   The bill prayed for an accounting, and that upon
the sum due from Rex to Conkey being ascertained and
paid by Rex, the premises be conveyed to Rex in fee.

Conkey's answer admitted most of the allegations of the
bill concerning the Dakota land, and the deed from Carr to
himself, and that he gave the notes and mortgage to Carr
and assumed the Adams mortgage, and leased the premises
to Loren H. Carr; that Rex took possession and he gave
Rex and his wife the leases alleged, and that Rex paid the
rent and made some of the improvements alleged, though
he averred he paid for most of these improvements either
directly or by deductions from the rent; but the answer de-
nied the making of the contract alleged to have been left
with Smith, and asserted that Conkey bought said premises
from Carr and is the absolute owner; and it alleged that
all Rex's interest was to get his debt to Conkey paid, by in-

ducing Carr to take the Dakota land at $1,000, which was all the Dakota land was worth, and a little less than Rex owed Conkey on said mortgage thereon. The answer alleged that there was never any contract or arrangement between Conkey and Rex for the purchase of said premises by Rex till the making of the first lease for five years, at which time the entire contract was inserted in said lease; that that contract expired with said lease and was never renewed, and was not fraudulently omitted from the subsequent leases. The statute of frauds was also relied upon in the answer.

Upon a hearing, a decree was rendered finding Rex entitled to a deed upon paying his indebtedness to Conkey, and referring the cause to the master for an accounting. This is an appeal by Conkey from that decree.

To repeat the testimony of the several witnesses and discuss the criticisms made thereon would unduly lengthen this opinion. We have read the evidence in the record itself in an endeavor to put ourselves in the position of the chancellor at the hearing, and have reached the conclusion that two contentions by Rex are established by the preponderance of the proof.

1. It was Rex and not Conkey who bargained for this land. It was Rex who found Carr and got him to agree to sell the place at $55 per acre and to take the Dakota land thereon at $1,000. It was at Rex's request that Carr conveyed the land to Conkey and that Conkey accepted the deed, assumed the Adams mortgage and gave the two $1,000 notes to Carr. What was Rex's motive in inaugurating and conducting these negotiations and in making several trips from his residence in Sublette, Lee County, to Meriden and Mendota, LaSalle County, about this business? Conkey attributes it to Rex's anxiety to procure the payment of his debt to Conkey secured by the Dakota land. But Conkey, by his testimony, endeavored to show that Rex held his financial obligations to Conkey very lightly and was accustomed to leave them unpaid for long periods after they were due. This transaction was on June 1, 1889, and

Rex's note to Conkey secured by the Dakota land was not to mature till January 1, 1891. It does not appear that Rex ever showed any anxiety to pay any other debt long before its maturity. In a letter from which a quotation is hereinafter made, Conkey had given Rex an intimation that he might ultimately give him this debt. It is not reasonable to suppose that Rex was in haste to pay a debt not due for one year and seven months and which his creditor had indicated he thought of donating to him.   Moreover, Conkey still has the $803 note.   The proof does not disclose any adequate motive for Rex's efforts in procuring the transactions of June 1, 1889, except his desire to procure the Carr farm for himself.   The proofs make Conkey's motive apparent.   Conkey was a successful business man of considerable means.   Rex was an old soldier of the civil war, a preacher, a teacher and a farmer, and financially unsuccessful.   Conkey's first wife was Rex's sister.   For many years Conkey had loaned money to Rex, paid Rex's debts, and signed notes as his security, till it had become almost his habit to do so.   His long course of prior conduct towards his unsuccessful brother-in-law had been very kind. He paid out no money for Rex on June 1, 1889, but by releasing his mortgage on the Dakota land and signing the notes to Carr and assuming the Adams mortgage, he loaned his credit to Rex and made it possible for the latter to secure a home.   This was a great kindness to his brother-in-law, and in harmony with his entire course of conduct toward him for some forty years; yet it was without any serious risk of financial loss.   The price at which the farm was bought, $55 per acre, was low.   Carr apparently did not live upon it, for the house was vacant when Rex did ten acres of fall plowing in the fall of 1889, and also when he came there with his family on February 26, 1890.   That an addition to the house and a new stable, corn crib and well were needed, and an orchard, tends to show that the farm had not been properly kept up.   It was reasonable to expect that Rex, going into possession and expecting to become the owner, would improve the place, as the proof

shows he did, and the place was likely to be worth all the liability Conkey assumed, besides securing his $803 as well as the Dakota land did.

2. Besides the papers executed on June 1, 1889, which are produced, there was a contract between Rex and Conkey, then drawn and executed, defining their respective rights and interests in this property, and it was left with Smith for safe keeping. Smith testified that not long afterwards Conkey called at his office and asked to see it, and he handed it to Conkey; that Conkey went away while he was busy at something else, and he never afterwards saw it. Conkey denied that he took it away, but he also denied there was such a paper in existence. At times he testified positively that there was no such contract. At other times he made the qualified statement that he had no recollection that such a contract was made, though he also testified that if he had been asked to make such a contract at that time he would have done so. Whether Conkey took the paper from Smith's office or it was lost in some other way, it is evident that Rex can not produce it, and that such inability is not his fault. We think the preponderance of the proof is that the contract provided that Rex should have possession of the lands at the date Carr was to surrender it, and that when he paid Conkey $1,000 of the sum assumed by Conkey, the latter should deed the farm to Rex and take notes for the balance of the debt and a mortgage on the farm to secure them, and that till he paid that $1,000, Rex was to pay Conkey a certain annual sum. Conkey testified that when this trade was made there was no talk even about Rex occupying the land at all, and that there was never a word said about an agreement for Conkey to convey the land to Rex till the first lease for five years was made, which was November 25, 1890. If this be so, why did Rex go upon the place in the fall of 1889, four or five months before Carr was to surrender possession, and do ten acres of fall plowing? This was several miles from where he then lived in Lee County. It is evident that something had occurred upon which he relied as giving him the right to occupy the farm

the next season.   Why did he move in with his family as soon as he heard that Conkey had leased the farm to Loren H. Carr, and before the time for Albert H. Carr to give up possession had arrived?   It is obvious that Rex was actively and promptly asserting some right he claimed. Conkey did not thereupon begin proceedings to dispossess Rex, nor did he even ask Rex why he had fall plowed or moved upon the land, but he at once let the place to Rex verbally, as he claims, till March 1, 1901, for a share of the crop.   Conkey's immediate acquiescence may mean a mere good-natured surrender to a trespassing relative, but it tends to indicate that he realized that Rex had rights there.   If there was such a written contract as Rex asserts, his acts in fall plowing the land and moving in with his family are explained; but if there had been no arrangement for him to have any interest in the Carr farm, then the evidence suggests no plausible reason for the course he pursued.   Since Rex took possession, he has put numerous improvements upon the land.   He built an addition to the house, with a brick foundation, a barn or stable, and a corn crib.   He set out a large orchard, consisting of apple, peach, plum, cherry, pear and apricot trees.   He dug a new well, being dissatisfied with the old one.   Conkey paid for the material used in most of these improvements, either by paying the bills therefor or by deducting Rex's expenditures therefor from the yearly sum he was to pay under the lease.   Rex testified that these were to be added to the total cost of the place to be paid by him, and Conkey admitted that it was so agreed if Rex took the place.   For some of the items Conkey refused to pay.   The feature of these transactions which seems to us to throw light upon the real relations of the parties to this farm, is the fact that Rex did not ask Conkey to make specified improvements, or to let him do so and deduct it from the rent.   Rex made such improvements as he pleased, and when and where he chose, and Conkey generally allowed the cost thereof without question.   It is not reasonable to suppose that the absolute owner of a farm would let a mere tenant improve

it from year to year to suit himself, and at the landlord's
expense. Nor can we conceive it probable that Conkey,
who appears to be a shrewd and careful business man, would
allow a tenant to pursue such a course at his expense, even
if the tenant had also an option to buy the place. But if the
contract was as Rex asserts, then it would be reasonable
that Conkey should permit him to make ordinary improve-
ments, so long as the improvements added to the value of
the farm as much as Conkey was called upon to advance
therefor.

In this connection a letter should be noticed which Con-
key wrote to Rex, April 28, 1894, nearly five years after
this trade was made. Conkey had been dunned upon a
note which he signed with Rex for the brick used in the
foundation of the addition to the house. In this letter he
urged Rex to get the money to pay this note, and said:

"I have had to borrow to pay interest on your place, and
soon I will have to pay Alex Adams $84 interest on the
same, and I am tired of being harassed for money to pay
on that place."

The words, "your place," naturally imply that he con-
sidered that the farm belonged to Rex. Conkey testified
in explanation that he had numerous farms each in the
occupation of a tenant; that he did not like to mortify his
tenants by speaking of them as his farms, and so was accus-
tomed to speak of each as the farm of the tenant who occu-
pied it. This, if true, does not explain the whole sentence.
Why should the owner of a farm write to his tenant com-
plaining he has to pay the unpaid purchase price which he
had agreed with the former owner to pay? What is there
about paying the agreed purchase price which should make
the owner "tired," and would he be likely to complain
thereof to his tenant? But if this farm had been bought
by Rex, and if Conkey had only loaned his credit, and ex-
pected that Rex would take the transaction off his hands
long before the date of this letter, by paying $1,000 and
giving notes and a mortgage for the rest of the price at
which Carr sold it, then it was natural that Conkey should

complain to Rex of his long delay in taking the responsibility off his hands.

Another letter from Conkey to 'Rex shows Conkey was familiar with the practice and advantage of taking a deed as security for a debt. The debt of $803 for which Rex gave Conkey his note on January 27, 1886, secured on the Dakota land, was evidenced by several prior notes for monies loaned and advanced by Conkey to Rex. On January 16, 1886, Conkey wrote Rex a letter which led to the giving of the new note for $803 and the mortgage securing it. Conkey told Rex in that letter that he had given his agent directions to figure the interest on the old notes at ten per cent to the date of the new one if Rex secured the new one by a mortgage, but if Rex made him a deed, then to figure the back interest at only eight per cent. After having held out this inducement to Rex to deed him the Dakota land as security for the debt rather than to mortgage it, Conkey further wrote:

"I thought it would be best for you to make the deed and take a lease, for you would get all the use of it. If you wanted to sell it, I could make the deed for you at any time, or you can keep it by paying me, or if I wish to give it to you hereafter, I can do so. It makes no difference to me, only fix it up one way or the other, and let us make a new start."

This letter makes it the more probable that Conkey would pursue such a course in regard to the Carr farm, if Rex was buying it on Conkey's credit.

It is suggested that the proof does not show that Rex was bound to pay, and therefore at most he had but an option to buy. Very little attention was paid to this subject in taking the testimony, but we find that Rex did expressly testify that he agreed to pay Conkey $1,000, and he repeatedly testified that he agreed that when he paid $1,000 he would then give Conkey his notes for the balance, secured by a mortgage on the farm. We conclude that the clause referred to in the first lease for five years can not be regarded as a substitute for the prior contract between the parties, and was not so intended by them, but was asked for

and inserted to show a recognition of that contract and to avoid any subsequent claim that the only contract between the parties was a mere lease. In oral argument for Conkey, it was suggested that the provision in that lease ran to Rex and wife, and as Mrs. Rex is not a party to this suit, the bill should have been dismissed. The point was not made in Conkey's printed brief and argument. Rex's counsel did not participate in the oral argument. We are therefore deprived of the aid of Rex's counsel on this subject. A point not presented in appellant's opening brief and argument is waived. Besides, this point was not raised in the court below, where it could have been obviated, if found well taken. It can not be presented here for the first time. Taking all the proof into consideration, it seems to us clear that the second and third leases were not designated as an abandonment of the prior written agreement between the parties.

If we are correct in our conclusion that there was a written contract entered into between Conkey and Rex on June 1, 1889, the statute of frauds is not a defense to the enforcement of that contract. If Rex went into possession under that contract and is still in possession, and has paid the $336 per year, whether that sum be called rent, or annual interest at seven per cent on $4,400 and the estimated taxes on the land, neither laches nor the statute of limitations present a defense. In equity the case is to be treated as if Carr had conveyed to Rex and Rex had conveyed to Conkey by a deed intended as security only, and Conkey had entered into the written contract referred to and Rex had taken and retained possession, and made annual payments under the contract. In such case, the right to redeem would be clear. Such was the substance of this transaction, though the parties avoided circuity and made the deed direct to Conkey. The proofs support the decree. It is therefore affirmed.

*Affirmed.*